997 P.2d 59

Melvin M. IGE, Petitioner–Appellant,

v.

**ADMINISTRATIVE DIRECTOR OF THE COURT, State of Hawai'i, Respondent–Appellee.**

No. 22466.

Intermediate Court of Appeals of Hawai'i.

Feb. 23, 2000.

Michael G.M. Ostendorp, Honolulu, for petitioner-appellant.

Kumu B. Vasconcellos and George K.K. Kaeo, Jr., Honolulu, Deputy Attorneys General, for respondent-appellee.

WATANABE, ACOBA, and LIM, JJ.

Opinion of the Court by ACOBA, J.

We hold that an Intoxilyzer operator's sworn declaration which stated, in essence, that a breathalyzer test for blood alcohol concentration was conducted in compliance with operator training and that the Intoxilyzer did not malfunction, states facts sufficient to establish compliance with Hawaii Revised Statutes (HRS) § 286–257(a)(3)(B) and (C) (Supp.1998) as part of the foundation for admission of the Intoxilyzer test result. Because the Intoxilyzer operator's declaration in the driver's license revocation proceeding brought against Petitioner–Appellant Melvin M. Ige (Petitioner) so stated, we affirm, on the grounds set forth herein, the March 9, 1999 decision and order of the District Court of the First Circuit (the court) affirming the January 4, 1999 administrative revocation of Petitioner's driver's license by the Administrative Driver's License Revocation Office (the ADLRO).

## I.

### A.

The following facts are adduced from the January 4, 1999 ADLRO findings of fact (findings), conclusions of law (conclusions),

and decision. At 1:37 a.m. on November 9, 1998, Honolulu Police Department (HPD) Officer Nathan Santos (Officer Santos) observed a silver Oldsmobile (the vehicle) weaving westbound on the H–1 Freeway somewhere before the Hickam off-ramp. While passing the vehicle, Officer Santos observed the vehicle cross over and straddle two traffic lanes before nearly sideswiping Officer Santos's vehicle. The officer drove past the vehicle and kept pace with it, traveling at about fifteen miles under the minimum speed limit of forty-five miles per hour. Officer Santos stopped the vehicle and then requested and obtained Petitioner's driver's license from him. When Officer Santos requested Petitioner's vehicle registration and insurance card, Petitioner provided a "medical/health card" instead.

The officer observed that Petitioner's eyes were "glassy" and "bloodshot," and that Petitioner appeared to be "lost." Officer Santos detected a moderate odor of an alcoholic beverage from Petitioner and noted that Petitioner's speech was slurred. After administering a field sobriety test to Petitioner, the officer believed Petitioner exhibited signs of intoxication.[1]

Petitioner was arrested and transported to the Kalihi Police Station. He was then told that he could take a blood test, breath test, or both, and was informed of the sanctions and consequences of refusing to be tested. Petitioner elected to take a breath test. The Intoxilyzer,[2] model 5000, number 66–003310, was used to test Petitioner. Intoxilyzer operator Joel K. Gonsalves (Gonsalves) administered the test. The test result revealed Petitioner's blood alcohol concentration to be .189 percent.

1. Honolulu Police Department Officer Nathan Santos administered the horizontal gaze nystagmus test, the one-leg stand, and the walk-and-turn test during his field sobriety test of Petitioner–Appellant Melvin M. Ige (Petitioner).

2. We have previously described the Intoxilyzer machine as follows:

 The Intoxilyzer is a machine that measures the concentration of alcohol in a breath sample (BrAC). 2 R. Erwin, *Defense of Drunk Driving Cases* § 21.01, at 21–2 to 21–3 (3d ed. 1999) ...; *see also State v. Gates*, 7 Haw.App. 440, 777 P.2d 717 (1989). The Intoxilyzer then reports either an assumed blood alcohol concentration (BAC) (which is achieved by multiplying the individual's BrAC by a conversion factor, a partition ratio of 2100 to 1), [*Id.*] at 443, 777 P.2d at 719, or a BrAC which is "usually in terms of grams [of] alcohol per 210 liters of breath, such as 0.10g/210L." [Erwin, *supra*,] § 21.01, at 21–2 to 21–3.
 *State v. Ito*, 90 Hawai'i 225, 228 n. 2, 978 P.2d 191, 194 n. 2 (App.1999).

The ADLRO was provided with Petitioner's driver's license and other relevant documents, such as the statements of the Intoxilyzer supervisor and the operator, and the statements of Officer Santos and HPD Officer Prudencio Dela Cruz (Officer Dela Cruz), who was a passenger in the car with Officer Santos on November 9, 1998.

## B.

The ADLRO revoked Petitioner's driver's license for the period from December 10, 1998 to December 9, 1999. Petitioner requested an administrative hearing on November 18, 1998. After two continuances at Petitioner's request, a hearing was held on December 31, 1998. Petitioner was present with counsel. Officer Santos and Officer Dela Cruz testified at the hearing. Petitioner did not call as witnesses the Intoxilyzer supervisor or the Intoxilyzer operator whose statements had been submitted to the ADLRO.

On January 4, 1999, the presiding hearing officer (hearing officer) issued a decision sustaining the ADLRO's revocation.

## C.

On February 3, 1999, Petitioner filed a petition for judicial review and a hearing was set for March 8, 1999, before the court. Petitioner was present with counsel at that hearing. At the March 8, 1999 court hearing, the court stated to Petitioner's counsel, "The [I]ntoxilyzer operator ... did submit a report. You're just alleging that the report is insufficient." To this, counsel for Petitioner responded, "Yes[.]" Petitioner argued the sworn statement of the Intoxilyzer operator did not reveal whether proper procedure was followed when administering the test to Petitioner.

[COUNSEL FOR PETITIONER]: ... Clearly that sworn statement [of the Intoxilyzer operator] establishes albeit inclusary terms but in terms I'm satisfied is in compliance with the statute; that the test was conducted pursuant to Department of Health Regulations.

*However, it does not establish that the test was otherwise conducted properly;* *that is, that the proper procedures necessary to use the machine were in fact followed in this case.*

(Emphasis added.)

After the hearing, the court issued a March 9, 1999 decision and order affirming the revocation of Petitioner's driver's license, stating, in relevant part, as follows:

Having considered the submission and arguments of counsel and the records and files herein, the [c]ourt hereby finds:

. . . .

5. The Administrative Director did not make a determination which was unsupported by the evidence in the record.

. . . .

The "Petitioner's Brief" references to page 4 of the transcript of the administrative hearing ... to show that the issue on appeal was raised in the administrative hearing. *However, the transcript does not support Petitioner's assertion that the issue was raised in the administrative hearing.* Not only did Petitioner not object to the admission of the intoxilyzer result, Petitioner affirmatively asked the Hearings Officer to "put in all the documents." (Record at 67) This request included both the "Sworn statement of the Intoxilyzer Operator" and the sworn statement of the [I]ntoxilyzer supervisor. (Record at 61 and 62.)

Since Petitioner did not raise the issue in the administrative hearing, this Court will not consider it on appeal. Even if it had been raised below, this Court would not engage in the conjecture urged by Petitioner. *There being no other issue on appeal and no plain error, the administrative revocation of Petitioner's driver's license is affirmed.*

(Emphases added.) Judgment was entered on March 9, 1999.

## II.

On appeal to this court, Petitioner argues that the court erred (1) in ruling that he had not raised an objection to the insufficiency of "established procedures" and "operating pro-

cedures" required under HRS § 286–257(a)(3)(B) and (C)[3]; and 2) in finding that evidence as to the testing procedure was sufficient to support Petitioner's driver's license revocation. Respondent–Appellee Administrative Director of the Court, State of Hawaii (the director) maintains that the court correctly denied the appeal because Petitioner failed to raise the issue of HRS § 286–257(a)(3) compliance, and the sworn statement of the Intoxilyzer operator met the statutory requirements of HRS § 286–257(a)(3)(B) and (C).

### III.

HRS § 286–257(a)(3) provides that following an arrest and submission to a test which "establishes that the arrestee's alcohol concentration was .08 percent or more,[4] the following shall be forwarded to the director": [5]

*The sworn statement of the person who conducted the test stating facts that establish that pursuant to section 321–161 and rules adopted thereunder:*

 . . . .

 (B) *The person followed the procedures established for conducting the test;*

 (C) *The equipment used to conduct the test functioned in accordance with operating procedures* and indicated that the person's alcohol concentration was at, or above, the prohibited level[.]

(Emphases added).

3. Petitioner referred only to Hawaii Revised Statutes (HRS) § 286–257(a)(3)(C) at the December 31, 1998 administrative hearing. However, at the March 8, 1999 hearing before the District Court of the First Circuit (the court) and on appeal, Petitioner challenged the procedure under both subsections (B) and (C) of HRS § 286–257(a)(3). For purposes of this appeal, we address the challenges made to HRS § 286–257(a)(3)(B) and (C) (Supp.1998).

4. HRS § 291–5 (Supp.1998) provides that

 [i]n any criminal prosecution for a violation of section 291–4, .08 or more grams of alcohol per one hundred milliliters or cubic centimeters of the defendant's blood or .08 or more grams of alcohol per two hundred ten

### A.

We conclude that the court erred in ruling that Petitioner did not raise the HRS § 286–257(a)(3) compliance issue at the administrative hearing.

Petitioner admits in his brief that his arguments to the hearing officer at the December 31, 1998 hearing were "concededly confused." The transcript of the proceedings, in pertinent part, states the following:

[COUNSEL FOR PETITIONER]: I was first going to say, let's not [go] any further, I'd like the license returned, because the sworn statement[6] isn't there, but I [now] see despite what I've got that there is a sworn statement. I will, however, refer the [h]earing [o]fficer to the Administrative Decision, this is HPD 396a, and nonetheless proceed.

*I note that the operational checklist, or as I read it in the statute, the requirement under § 286–257(a)(2)*—I'm sorry—it's interesting, (C), that is usually we consider the [I]ntoxilyzer supervisor, *but the checklist goes to show that the test was properly performed.* That is, that all the required steps, including observing the suspect for ·the required period of time prior to the blow, that during the period of observation the suspect didn't eat, smoke or place anything in his mouth, *that the proper steps to use the machine were taken*—

HEARING OFFICER: I'll note the following, counsel, just for counsel's information, this matter has been raised in the past and has been disclosed [sic] on, I

 liters of the defendant's breath within three hours after the time of the alleged violation as shown by chemical analysis or other approved analytical techniques of the defendant's blood or breath shall be competent evidence that the defendant was under the influence of intoxicating liquor at the time of the alleged violation.

5. "Director" is defined by HRS § 286–251 (Supp.1998) as "the administrative director of the courts or any other person within the judiciary appointed by the director to conduct administrative revocation under this part."

6. Counsel for Petitioner apparently was referring to the sworn statement of the Intoxilyzer operator.

believe, on judicial appeal. The situation arose where the [HPD], *this [h]earing [o]fficer[ ] will take administrative notice that they have since discontinued the [I]ntoxilyzer checklist for—I'm not sure how long.*

[COUNSEL FOR PETITIONER]: This machine.

HEARING OFFICER: For awhile.

[COUNSEL FOR PETITIONER]: Okay.

HEARING OFFICER: And this matter was then raised at that time.

[COUNSEL FOR PETITIONER]: Right.

HEARING OFFICER: Taken up and disposed of, *just to let counsel be aware of, I will find that Title 11, Chapter 114, does not require a checklist, neither does the statute and I do believe there is a Hawaii Supreme Court case, as well as judicial review decision that has addressed this* (inaudible)—

[COUNSEL FOR PETITIONER]: I think you're right as to judicial review, but I don't think— ·

HEARING OFFICER: There is a Hawaii Supreme Court case and if we take a recess, I can get it[.]

. . . .

HEARING OFFICER: ... *During the interim, I did find the case and I do refer to counsel, it's State versus Rolison*[.]

. . . .

HEARING OFFICER: *It says,* (inaudible) *however, the rules do not provide for the use of checklist by [I]ntoxilyzer operators in Hawaii.*

[COUNSEL FOR PETITIONER]: Okay.

(Emphases added.)

We believe it evident that Petitioner did challenge the procedure under which he was tested. Petitioner noted the absence of an "operational checklist" which he believed was necessary "to show the [Intoxilyzer] test was properly performed." The hearing officer understood the objection by referring him to a decision by this court concerning foundation for admission of the Intoxilyzer results. *See* discussion *infra.*

**B.**

 We note, first, that we do not entirely agree with the hearing officer's interpretation of *State v. Rolison,* 6 Haw.App. 569, 733 P.2d 326 (1987). In *Rolison,* this court set out three foundational requirements for the admission of an Intoxilyzer test result, stating that

> a proper foundation must be laid "showing that (1) the Intoxilyzer was in proper working order; (2) its operator was qualified; and (3) the test was properly administered." [Also,] "in meeting the foundational prerequisites for the admission of the Intoxilyzer test result there must be a showing of strict compliance with those provisions of [Chapter 111 of Title 11 of the Hawaii Administrative Rules (HAR or Rules)] which have a direct bearing on the validity and accuracy of the test result."

*Id.* at 571, 733 P.2d at 327 (quoting *State v. Souza,* 6 Haw.App. 554, 558, 732 P.2d 253, 257 (1987)). From our reading of the hearing transcripts, it appears that the hearing officer cited *Rolison* for the proposition that "Honolulu Police Department Operational Checklist" for the Intoxilyzer is no longer required. In *Rolison,* however, this court did not rule that an Intoxilyzer checklist may not be used in conjunction with other evidence. Rather, this court rejected the State of Hawaii's argument that the Intoxilyzer checklist and the testimony of the Intoxilyzer operator alone were sufficient to lay the foundation for admission of an Intoxilyzer test result.[7] *Id.* at 572, 733 P.2d at 328. It

7. In *State v. Lewis,* 6 Haw.App. 624, 626, 736 P.2d 70, 72 (1987), this court reiterated that "to meet the foundational requirements for the admission of the Intoxilyzer test result into evidence, there must be a showing of strict compliance" with applicable Rules. *See also State v. Arakaki,* 7 Haw.App. 48, 744 P.2d 783 (1987), *overruled on other grounds by State v. Dow,* 72 Haw. 56, 61, 806 P.2d 402, 405 (1991), in which the State conceded that insufficient foundation had been laid for admission of the Intoxilyzer result.

was held that the test result had been erroneously admitted into evidence because there was no evidence that the Intoxilyzer *itself* was in proper working order. *Id.* at 571, 733 P.2d at 327. Contrasting the rules in Alaska and Colorado which recognized checklists as providing sufficient foundation for admission of Intoxilyzer test results, this court pointed out that in Hawaii, the Rules governing breath testing instruments "d[id] not provide for the use of checklists by Intoxilyzer operators" as sufficient foundation. *Id.* at 572, 733 P.2d at 328.

The hearing officer apparently focused on the foregoing language from *Rolison* in responding to Petitioner's query about the checklists. However, in context, the quoted language only meant that an operational checklist, unlike in Alaska and Colorado, was not sufficient under the Hawaii Rules to establish that the Intoxilyzer itself was in correct working order. This court did not decide that an operational checklist may not be used and made a part of the evidence submitted.

### IV.

In affirming Petitioner's administrative revocation, the court rejected Petitioner's argument that "there was a lack of evidence of compliance with th[e] 'established procedures' and 'operating procedures' [which] constitutes a fatal defect."

Our examination of legislative history relating to HRS § 286–257(a)(3)(B) and (C) provides little guidance regarding the type of facts that the legislature would consider sufficient to establish that a breathalyzer operator followed proper procedures for conducting the test, and that the breathalyzer equipment functioned in accordance with operating procedures.

In enacting the section governing administrative revocation provisions in Chapter 286, the legislators included "several provisions to protect innocent persons, including an admin-

istrative review of the arrest and an administrative hearing before the administrative revocation [went] into effect, and judicial review if the hearings officer f[ound] against the arrestee." Conf.Comm.Rep. No. 137, in 1990 Senate Journal, at 825. However, the committee members did not provide any elucidation of the requirement that facts must be stated establishing that the mandates in HRS § 286–257(a)(2) and (3) were carried out. .

### V.

█ Nevertheless, we note that in *Park v. Tanaka,* 75 Haw. 271, 859 P.2d 917 (1993), a similar challenge to the factual sufficiency of a sworn statement was raised against the companion provision of HRS § 286–257(a)(2)(A), (B) and (C) (Supp.1992). In language similar to HRS § 286–257(a)(3), HRS § 286–257(a)(2) required that "[t]he sworn statement of the person" responsible for the maintenance of the testing equipment state "facts which establish" the necessary foundation for admission of the Intoxilyzer test result. HRS § 286–257(a)(2) required that the director be provided with

> [t]he sworn statement of the person responsible for maintenance of the testing equipment *stating facts which establish* that pursuant to section 321–161 and rules adopted thereunder:
>
> (A) The equipment used to conduct the test was approved for use as an alcohol testing device in this State;
>
> (B) The person had been trained and at the time the test was conducted was certified and capable of maintaining the testing equipment; and
>
> (C) The testing equipment used had been properly maintained and was in good working condition when the test was conducted.[8]

(Emphasis added.) The petitioner in *Park* appealed from the administrative revocation of her driver's license, arguing, *inter alia,* that the sworn statement submitted by the

---

**8.** The 1992 version of subsections (2)(A), (B), and (C) of HRS § 286–257(a), in effect at the time the Hawai'i Supreme Court decided *Park v. Tanaka,* 75 Haw. 271, 859 P.2d 917 (1993), is the same as the present version of subsections (2)(A), (B), and

(C) of HRS § 286–257(a) (Supp.1998), except "that" has been substituted for the word "which" in the phrase "stating facts which establish" in subsection (2).

Intoxilyzer supervisor "d[id] not provide facts, as required by [HRS § 286–257(a)(2) ], for the ADLRO officers to make the required determinations." 75 Haw. at 275–76, 859 P.2d at 920.

■ The sworn statement form of the Intoxilyzer supervisor in *Park* contained the following representations:

1. I am a duly certified [I]ntoxilyzer supervisor trained to maintain and verify the accuracy of Intoxilyzer ___ (Serial Number). This Intoxilyzer, used to test the arrestee, is an alcohol testing device approved for use in the State of Hawaii pursuant to Section 321–161 of the [HRS].

2. The Intoxilyzer used had been in proper working order when the test was conducted.

*Id.* at 277–28, 859 P.2d at 920–21. The supreme court concluded that subsections (A), (B) and (C) of HRS § 286–257(a)(2) were satisfied by the foregoing statements:

> The requirements of HRS § 286–257(a)(2)(A) and (B) are satisfied by the first part of the supervisor's sworn statement. The statement that "[t]he Intoxilyzer used ha[s] been in proper working order when the test was conducted" presupposes that the supervisor tested the machine and that it was working properly, thus fulfilling the requirements of HRS § 286–257(a)(2)(C).

> *We hold that the standard form submitted by the [I]ntoxilyzer supervisor states sufficient facts to comply with the requirements of HRS § 286–257(a)(2) and that the instrument is presumed to be properly functioning for thirty days after its successful testing for accuracy.*

*Id.* at 278–79, 859 P.2d at 921 (emphasis added). Under the supreme court's holding, it appears that the summary declaration by the Intoxilyzer supervisor in *Park* stated facts sufficient to comply with the requirement of HRS § 286–257(a)(2). With this in mind, we examine the challenged sworn statement form of the Intoxilyzer operator in the instant case.

### VI.

■ Initially, we observe that the Intoxilyzer supervisor's sworn statement as to the accuracy of the equipment is not challenged by Petitioner. As in *Park*, HRS § 286–257(a)(2) applies with respect to the supervisor's statement. The Intoxilyzer supervisor's sworn statement is similar to that evaluated in *Park* and confirms that the Intoxilyzer in question was in proper operating condition.

The printed form in the record entitled, "HONOLULU POLICE DEPARTMENT INTOXILYZER 5000 ACCURACY TEST SUPERVISOR'S SWORN STATEMENT," contains a computer printout of data [9] after which is set forth the following printed and completed statement:

> I, Donald W. Stafford [(Stafford)], swear that the aforementioned information is true and correct and that *I am a duly licensed Intoxilyzer 5000 supervisor trained to maintain and perform accuracy tests on the Intoxilyzer 5000.* The Intoxilyzer 5000 is a breath alcohol testing instrument approved for use in the State of Hawaii pursuant to section 321–1611 of the [HRS] as amended. *The Intoxilyzer was operating accurately in compliance with the State of Hawaii Department of Health Administrative Rules, Title 11, Chapter*

**9.** The computer printout states:

```
LOC=KALIHI
INTOXILYZER — ALCOHOL ANALYZER
MODEL 5000 SN 66–003310
11/01/1998
 g/210L BrAC TIME
AIR BLANK .000 10:48
SIM TEMP=34.0 > .2 DEG C
REF. SAMPLE 1 .098 10:49
AIR BLANK .000 10:49
AIR BLANK .000 10:50
SIM TEMP=34.0 > .2 DEG C
```

| | g/210L | TIME |
|---|---|---|
| REF. SAMPLE 1 | .196 | 10:50 |
| AIR BLANK | .000 | 10:50 |
| INTERNAL 1 | .101 | 10:51 |
| INTERNAL 2 | .201 | 10:51 |
| INTERNAL 3 | .302 | 10:51 |
| AIR BLANK | .000 | 10:51 |

The printout information is not explained. We gather that "LOC" means location, "Kalihi" refers to Kalihi Police Station, the model number (5000) and serial number (66–003310) identify the Intoxilyzer used, and November 1, 1998 relates to the date the accuracy of the Intoxilyzer was tested.

*111–7, on the date indicated below, when I conducted the accuracy test* recorded on this document.

Below this paragraph are the date, November 1, 1998, Stafford's signature, what appears to be Stafford's license number, 0012S, and his license expiration date, March 28, 2001.

## VII.

### A.

■ The Intoxilyzer operator's sworn statement is a pre-printed document entitled, "SWORN STATEMENT OF INTOXILYZER OPERATOR." Beneath this title, spaces for the arrestee's name and social security number, as well as the report number and date of arrest have been completed with information relating to Petitioner's case. The left side of the printed form contains the following information, which appears to be computer printout data:

```
LOC=KALIHI
INTOXILYZER — ALCOHOL ANALYZER
MODEL 5000 SN 66–003310
11/09/1998

REPORT NO= 98412465
ARRESTEE NAME= IGE, MELVIN M
ARR DOB =03/15/45
SSN = [omitted]
STATUTE NO= 291–0004
OPERATOR NAME=GONSALVES, JOEL K
OPER LIC NO= 0512
LIC EXP DATE= 05/02/01
```

| | G/210L BrAC | TIME |
|---|---|---|
| DIAGNOSTIC | PASSED | 02:36 |
| AIR BLANK | .000 | 02:37 |
| SUBJECT | .189 | 02:37 |
| AIR BLANK | .000 | 02:38 |
| INTERNAL STD | PASSED | 02:38 |
| AIR BLANK | .000 | 02:38 |

The computer printout data is not explained.[10]

On the right side of the form is a section labeled "Administrative Driver's License Revocation." Beneath this heading is a pre-printed and completed statement indicating that Petitioner had been informed of the sanctions under Hawaii's Administrative Driver's License Revocation Law by the arresting officer and had "elected to take a breath test." Officer Santos's name, the date of November 9, 1998, and the time of 2:25 a.m. are written in this section.

Below this section is another pre-printed part labeled "Observation," and which states that the arrestee "was under observation by this operator" and that "the subject did not ingest alcoholic beverages, eat, smoke, or vomit for the twenty (20) minutes immediately preceding this test." The date and time of the Observation is written in as November 9, 1998 from 2:14 a.m. until 2:37 a.m.

Under the Observation section is the following statement as to the performance and result of the test:

I, J. GONSALVES, a qualified Intoxilyzer 5000 operator, 0512, 5–2–01, swear that the following is [sic] true and correct:

1. *I administered a breath test to [Petitioner], in compliance with operator training and Title 11, Chapter 114,* Hawaii Administrative Rules;

2. *The Intoxilyzer model 5000 indicated no errors or malfunctions during the testing of [Petitioner];*

3. [Petitioner's] breath alcohol content, as shown, was 1.89 grams of alcohol per 210 liters of breath.

(Emphases added.) Near the bottom of the form is the apparent signature of Petitioner who is identified as "arrestee." Below his signature are the words "ACCURACY VERIFICATION TEST (Internal Standards)." The box labeled "PASS" is marked and the box labeled "FAIL" is blank. A section labeled "Arrestee's Appearance/Demeanor" is also blank. At the very bottom of the page

---

10. We are able to discern information from this computer printout regarding the Intoxilyzer and the date of the test. *See supra* note 9. It is evident that: 1) "REPORT NO" means the police report number; 2) "ARR DOB" means arrestee's date of birth; 3) "SSN" means social security number; 4) "STATUTE NO=291–0004" refers to HRS § 291–4, "Driving under the influence of intoxicating liquor," the charge for which Petitioner had been arrested; 5) "OPER LIC NO" refers to the Intoxilyzer operator's license number; and 6) "LIC EXP DATE" means the expiration date of the Intoxilyzer operator's license. We also assume that "ARRESTEE NAME" and "OPERATOR NAME" refer to Petitioner and the Intoxilyzer operator, respectively. "BrAC" refers to the concentration of alcohol in the breath sample. *See supra* note 2.

is the apparent signature of the Intoxilyzer operator, Gonsalves. Alongside his signature is an "ID No." and the number "100308" which we assume is the Intoxilyzer operator's identification number, and the "DATE/ TIME" completed as "11–9–98/0242" which we assume means November 9, 1998 and 2:42 a.m., the undisputed time of the Intoxilyzer test.

## B.

In *Park*, the Intoxilyzer supervisor stated he was "duly certified" and "trained to maintain and verify the accuracy of [the] Intoxilyzer[.]" 75 Haw. at 277, 859 P.2d at 920. As to the accuracy of the Intoxilyzer test result, the supervisor's plain statement was that the "Intoxilyzer ... [was] in proper working order when the [breathalyzer] test was conducted." *Id.* at 278, 859 P.2d at 921. This was deemed sufficient without further elaboration to establish that the "supervisor [had] tested the machine and that it was working properly." *Id.* at 279, 859 P.2d at 921.

In the instant case, Gonsalves's statement contains similar declarations. First, Gonsalves's statement indicated that he "administered the breath test to [Petitioner] in compliance with [his] operator training and [with] Title 11, Chapter 114, [of the HAR,]" which are the "procedures established for conducting the test" referred to in HRS § 286–257(a)(2)(B). Second, Gonsalves's statement represented that the Intoxilyzer "indicated no errors or malfunctions during the testing[.]" This statement, taken in conjunction with Stafford's sworn statement, verified that the "equipment function[ed] in accordance with operating procedures" as mandated by HRS § 286–257(a)(3)(C). Thus, under the approach adopted in *Park*, Gonsalves's sworn statement set forth sufficient facts to establish that the requirements of HRS § 286–257(a)(3)(B) and (C) had been satisfied.

Gonsalves's sworn statement also addresses Petitioner's concerns as to whether Petitioner had been observed "for the required period of time before the blow," and that during this time, Petitioner "didn't eat, smoke, or place anything in his mouth[.]" As already indicated, the Observation section of the form indicates that Petitioner was under observation from 2:14 a.m. until 2:37 a.m. and that during this time period, Petitioner "did not ingest alcoholic beverages, eat, smoke, or vomit[.]"

We acknowledge that the Intoxilyzer operator form is confusing. As pointed out, there is no explanation of the terms employed on what appears to be the computer generated part of the form.[11] The layout of the form can lead the reader to infer that Gonsalves "swore" only to the three statements which follow his affirmation.[12] The operational checklist previously used by the police appeared to have been clearer.[13]

We are reluctant, however, to give a limiting construction to the form. As said previously, the statements expressly sworn to by Gonsalves were sufficient to satisfy HRS § 286–257(a)(3)(B) and (C). The form was entitled "SWORN STATEMENT OF INTOXILYZER OPERATOR." The computer printout portion identifies Gonsalves as the Intoxilyzer "operator." Gonsalves signed the bottom of the form. Thus, we conclude all of the information on the form may be treated as "sworn to" by Gonsalves.

## VIII.

Accordingly, we reverse that part of the March 9, 1999 ruling of the court concluding that Petitioner did not raise the issue of compliance with HRS § 286–257(a)(3) at the administrative hearing. However, in light of our discussion herein, we affirm the court's March 9, 1999 judgment affirming the January 4, 1999 director's administrative revocation of Petitioner's driver's license.

---

11. We note that Petitioner did not question the data presented on the form and, therefore, we assume the data was understood by him.

12. Obviously, any confusion might be avoided by reorganizing the form so that all sections are encompassed under the Intoxilyzer operator's affirmation.

13. In *Lewis*, 6 Haw.App. at 625, 736 P.2d at 72, this court described the Intoxilyzer checklist as including "three phases in sequence: (1) preparation, (2) testing of the subject, and (3) calibration."